CASE 23.—ACTION OF THE COMMONWEALTH BY HOLLAND L. ANDERSON, REVENUE AGENT, FOR THE COMMONWEALTH AGAINST THE CITY OF PADUCAH. —January 20, 1910.

## City of Paducah v. Commonwealth

Appeal from McCracken Circuit Court.

W. M. REED, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Reversed.

1.  Taxation—Exemption—Cemeteries.—The cemetery of a city expending the moneys realized from the sale of unsold lots and the income from rentals in maintaining the cemetery is exempt from taxation by the state under Const. Sec. 170, exempting from taxation places of burial not held for profit.
2.  Taxation—Exemption—Market Places.—The market place and stalls therein owned and maintained by a city where gardeners and fresh meat venders may display their goods for sale, under regulations prescribed by the city, at a rental charge for their use for the payment of the expense of maintenance, are exempt from taxation by the state under Const. Sec. 170, exempting from taxation public property used for public purposes.

JAS. CAMPBELL, Jr., and GREENE, VANWINKLE & SCHOOLFIELD for appellant.

FRANK A LUCAS for the Commonwealth.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

This appeal involves the right of the commonwealth to tax the wharf, market house, and two public cemeteries owned by the city of Paducah.

This question, in so far as the wharf property is concerned, has recently been fully considered by this court in the case of Commonwealth v. City of Louisville, 119 S. W. 160, 133 Ky. 845, and it was there held that the wharf was not subject to taxation. As we still adhere to the conclusion reached in that opinion, we dismiss this branch of the litigation from further consideration.

The right of the commonwealth to assess for taxation public cemeteries, or the unsold portions thereof and the funds accumulated from the sale of lots therein, was considered by this court in the case of Negley v. City of Henderson, 55 S. W. 554, 21 Ky. Law Rep. 1394, and Commonwealth v. Lexington Cemetery Co., 114 Ky. 165 70 S. W. 280, 24 Ky. Law Rep. 924. In the former case it was held that the unsold lots in the cemetery were not exempt from taxation, but this opinion was rested upon the ground "that the averments of the petition do not show that the lot in question is exempt from taxation because of the absence of an averment that it is not held for profit," and section 170 of the Constitution only exempts places of burial not held for private or corporate profit. Undoubtedly, under the state of case presented by the pleadings, that case could not have been decided otherwise. In the case of the Commonwealth v. Lexington Cemetery Co. there was involved the right of the commonwealth to assess a fund which had accumulated in the hands of the cemetery company from the sale of lots, amounting to some $30,000 or $40,000. This, the court held, was subject to taxation, although in that opinion it is expressly stated that the place of burial is exempt from taxation. In other words, the court there decided that the constitutional provision did not exempt from taxation a fund which had been

accumulated by the cemetery company, although the income therefrom may have been used in the maintenance and adornment of the cemetery.

In the case under consideration it is shown that all of the money realized from the sale of such lots as have been sold, and the total income from the rentals received from the new cemetery, are expended upon the cemetery grounds. There is no fund on hand, and the city realizes no profit therefrom. It is clear that the only purpose of the city in owning these cemeteries at all is to furnish to such of its citizens as are able to pay therefor a suitable burial lot at a nominal cost, and to furnish to such as are not able to pay therefor burial lots free of cost. It exercises a general supervision over these cemeteries, and sees that they are properly kept, and that no nuisance is committed thereon. As lots are sold off, they become the property of their respective purchasers, though at all times under the supervision and control of the city, and the city continues to look after and care for and improve its walks and ways and otherwise adds to its beauty and adornment. It is this feature that makes the public ownership of burying grounds especially attractive, for, if this duty devolved upon the individual owners of the lots therein, the grounds would soon become neglected, and, as owners died or moved from the immediate locality, there would be left no one having any direct interest in the care of the cemetery, and it would soon become grown up in underbrush, briars, and weeds, a place more fitting for the abode of varments and reptiles than a resting place for our dead. In earlier times there were no public cemeteries other than the potters' fields, where the city's pauper dead were buried. All who were able were buried in private burying grounds. So

long as the owners of these grounds lived they were usually cared for and kept up, but as years rolled by frequently they were neglected and went rapidly to decay, and private burying grounds frequently became so unsightly as to be looked upon as almost public nuisances. In casting about for some remedy the municipal ownership of burying places was adopted, and it has proven most desirable and advantageous. The private cemetery today is the exception to the rule, for most people prefer that those near and dear to them in life should, in death, have their resting place chosen where it will always be looked after and properly cared for. The growth and development of the municipal cemetery has kept pace with the advancement, mental, moral, and social, of our people. It is common knowledge that the cities throughout the country, and especially the larger cities, have built up and maintained at an enormous expense their burying grounds, and these in many instances are so beautified by landscape gardening, the growth of shade trees, shrubbery, and flowers, and the building of walks and drives, that they have come to be looked upon as among the attractive features of the city. This policy on the part of our cities and towns should be encouraged by the government, and every step taken by our municipalities looking toward the betterment, physically, mentally, socially, and morally, of our people should meet with the governmental stamp of approval. Our people need to be taught that life has an aim higher than the mere accumulation of wealth, and the government owes a duty to her citizens over and above that of levying and collecting taxes. The framers of the Constitution, recognizing that there should be a reasonable limitation upon the taxing power of the state

over cemeteries, provided, among other things, that burial places not held for profit should be exempt from taxation.

Clearly these cemeteries are not taxable, unless the manner in which they are governed by the city takes them out of the exempted class. As lots are sold, the money is collected by the city, and all of it is expended upon the grounds, in their policing, keeping, and care. Upon this feature of their management much stress is laid. It is true that the city receives the money therefor. Amd for this reason, it is urged, the property is held for profit, and that, even though no profit remains to the city after the expenses incurred by it in the management and care of the cemetery, this fact does not exempt the property from taxation. Section 170 of the Constitution expressly exempts places of burial from taxation where they are not held for profit. Since the city derives no profit from these cemeteries, but uses all of the income derived therefrom and more in their maintenance, we are unable to see how it can be claimed that they are held for profit. The question is much simplified if we will look at it from another standpoint. Suppose, instead of selling the lots to individuals at from $25 to $50 per lot, according to location, size, etc., and spending this money in caring for and beautifying the cemetery, the city would say to one desiring to purchase a lot, ''You may have a lot, valued at from $25 to $50, provided you will do from $25 to $50 worth of work, according to the value of the lot selected by you, upon the cemetery grounds.'' Here the city would be receiving no money whatever, and yet the result, so far as the cemetery is concerned, would be the same. The citizen would be-

come the owner of the lot, and the value thereof, as agreed upon between the city and the prospective purchaser, would be expended upon the cemetery grounds. This is in effect what the city does indirectly. What it may do indirectly without subjecting the property to taxation it may do directly.

The pleadings in the case under consideration take it beyond the rule announced in the Henderson Case, supra, and there is no allegation or proof which would bring this case within either the letter or the spirit of the Lexington Case. We are of opinion that neither of the cemeteries should be taxed.

The only remaining question is: Should the market place and house be taxed? The market place is essential to the material welfare of the citizens. It furnishes a place where the gardeners and fresh meat venders may display their goods for inspection and sale under such reasonable regulations as the city authorities may prescribe. As an incident to the proper conduct of a market place, we invariably find the market house or stalls, where, upon stated days of the week, the great bulk of the vegetables, fruit, and fresh meats upon which the inhabitants of the city live are publicly exposed for inspection and sale. If any are found to be unfit for use, they are promptly condemned, and their vender suitably punished. The public health is thereby protected and promoted. The handling of this great quantity of vegetable and animal matter necessarily creates and leaves upon the market place much waste and decayed material. This has to be removed and the street and space kept in a clean and sanitary condition, necessarily entailing upon the city a considerable expense. This expense, or rather extra expense, is met by the imposition of a rental charge for the use of the market

place and stalls, and until it is shown that the city is renting its market as a revenue producer rather than as a means of carrying out and enforcing one of its police powers, to-wit, the protection of its people against the sale of stale or impure food stuffs, it must be regarded as falling within both the spirit and the letter of section 170 of the Constitution, and its use declared to be a purely public one. The market place is intended for the use of the local or nearby gardeners, butchers, etc., just as the public wharfs are for the foreign or distant tradesmen. The maintenance of each is for the public good, and neither is kept for profit. The fact that those who use them are required to pay a nominal charge therefor does not justify the conclusion that they are held for profit. The statute authorizes the city to have a market place. This carries with it necessarily the building of a house or stalls, and it is but right and fair to the citizens that those who derive a personal benefit from the use of this public property should be made to bear the burden assumed by the city in establishing and maintaining it.

We are of opinion that the market place, house, and stalls are held and maintained for a purely public purpose, and the collection of the charges made against those who use them is but an incident to, rather than an evidence of the purposes for which they are maintained. This being so, the property should not be taxed. Wherefore, the whole court sitting, the judgment is reversed and cause remanded for proceedings consistent herewith.

Judges NUNN and CARROLL dissent from so much of this opinion as holds that the wharf property and market house are exempt from taxation.